**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

H.B. ROWE COMPANY,
INCORPORATED,

    *Plaintiff-Appellant,*

    v.

W. LYNDO TIPPETT, individually; P.
E. LEN A. SANDERSON,
individually; J. G. NANCE, in his
official capacity as Chief
Engineer-Operations of the North
Carolina Department of
Transportation; EUGENE A. CONTI,
JR., in his official capacity as
Secretary of the North Carolina
Department of Transportation;
TERRY R. GIBSON, in his official
capacity as State Highway
Administrator of the North
Carolina Department of
Transportation,

    *Defendants-Appellees.*

> No. 09-1050

NAACP LEGAL DEFENSE AND
EDUCATION FUND, INC.,

  *Amicus Supporting Appellees.*

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:03-cv-00278-BO)

Argued: March 24, 2010

Decided: July 22, 2010

Before NIEMEYER and MOTZ, Circuit Judges, and
James A. BEATY, Jr., Chief United States District Judge
for the Middle District of North Carolina,
sitting by designation.

---

Affirmed in part, reversed in part, and remanded by published
opinion. Judge Motz wrote the majority opinion, in which
Judge Beaty concurred. Judge Niemeyer wrote a separate
opinion concurring in the judgment. Judge Beaty wrote a sep-
arate concurring opinion.

---

**COUNSEL**

**ARGUED**: Ralph William Kasarda, Jr., PACIFIC LEGAL
FOUNDATION, Sacramento, California, for Appellant.
Christopher Grafflin Browning, Jr., NORTH CAROLINA
DEPARTMENT OF JUSTICE, Raleigh, North Carolina, for
Appellees. **ON BRIEF:** Kevin Van Parsons, SMITH, PAR-
SONS & VICKSTROM, PLLC, Charlotte, North Carolina;
James S. Burling, Sharon L. Browne, PACIFIC LEGAL
FOUNDATION, Sacramento, California, for Appellant. Roy
Cooper, Attorney General of North Carolina, John F. Mad-
drey, Assistant Solicitor General, Tiare B. Smiley, Special
Deputy Attorney General, Elizabeth Leonard McKay, Special
Deputy Attorney General, NORTH CAROLINA DEPART-
MENT OF JUSTICE, Raleigh, North Carolina, for Appellees.
Joshua Civin, NAACP LEGAL DEFENSE & EDUCA-
TIONAL FUND, INC., Washington, D.C.; John Payton,
Director-Counsel, Debo P. Adegbile, Matthew Colangelo, Joy
Milligan, NAACP LEGAL DEFENSE & EDUCATIONAL

FUND, INC., New York, New York, for NAACP Legal Defense and Education Fund, Inc., Amicus Supporting Appellees.

---

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

This case arises from the attempt by the people of North Carolina and their elected representatives to end racial and gender-based discrimination in state highway construction subcontracting. The State's statutory scheme—the product of extensive study and refinement in response to developments in federal law—requires prime contractors to engage in good faith efforts to satisfy participation goals for minority and women subcontractors on state-funded projects. Through these nonmandatory, project-specific participation goals, the State seeks to provide a fair opportunity for all subcontractors to compete for public work.

Denied a contract because of its failure to demonstrate good faith efforts to meet these participation goals, a prime contractor brought this action, asserting that the goals violate the Equal Protection Clause, and seeking injunctive relief and money damages. After extensive discovery and a bench trial, the district court held the challenged statutory scheme constitutional both on its face and as applied. The contractor appeals.

We do not believe that the State met its burden of proof in all respects. But we agree with the district court that the State produced a strong basis in evidence justifying the statutory scheme on its face, and as applied to African American and Native American subcontractors, and that the State demonstrated that the scheme is narrowly tailored to serve its compelling interest in remedying discrimination against these

racial groups. Accordingly, for the reasons that follow, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

We begin with a summary of the statutory scheme and the litigation at issue here.

## A.

In 1983, the North Carolina General Assembly enacted a statute setting forth a general policy promoting the use of "small, minority, physically handicapped and women contractors" in State construction projects. N.C. Gen. Stat. § 136-28.4 (1983). The statute directed the North Carolina Department of Transportation ("the Department") and other State agencies to "encourage and promote" this policy. *Id.* In 1989 and 1990, the legislature amended section 136-28.4 to set specific participation goals on State transportation construction contracts, first for minority-owned businesses (10 percent) and then for women-owned businesses (5 percent). N.C. Gen. Stat. § 136-28.4(b) (1990). The Department promulgated and implemented regulations pursuant to section 136-28.4 titled "Minority Business Enterprise and Women Business Enterprise Programs for Highway and Bridge Construction Contracts" (collectively "the Program"). 19A N.C. Admin. Code 2D.1101 (1997). The North Carolina statutory scheme largely mirrored the federal Disadvantaged Business Enterprise ("DBE") program, with which every state must comply in awarding highway construction contracts that utilize federal funds.[1] For example, as in the DBE program, a prime contrac-

---

[1]Federal highway statutes require that states set aside a portion of federal highway construction funds for payment to businesses owned and controlled by "socially and economically disadvantaged individuals." *E.g.*, Surface Transportation and Uniform Relocation Assistance Act of 1987, Pub. L. No. 100-17, § 106(c), 101 Stat. 132, 145 (1987); *see also* 49 C.F.R. § 26.5 (2010). Federal courts of appeal have uniformly upheld the federal DBE program against equal-protection challenges. *See, e.g.*, *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147 (10th Cir. 2000).

tor in North Carolina would be excused from the specific sub-contracting participation goals by demonstrating good faith efforts to attain such goals. *See id.* at 2D.1110; 49 C.F.R. § 26.53 (1999).

In 1991, a North Carolina prime contractor challenged in state court the constitutionality of section 136-28.4. *See Dickerson Carolina, Inc. v. Harrelson*, 443 S.E.2d 127 (N.C. Ct. App. 1994), *appeal dismissed*, 448 S.E.2d 520 (N.C. 1994). The contractor relied on *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493-94 (1989), which affirmed the principle that courts must apply strict scrutiny to all race-conscious legislation. In *Croson* the Supreme Court recognized that "[i]t is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice." *Id.* at 492. The Court held, however, that to remedy such discrimination through race-conscious measures, a governmental entity must identify with "some specificity" the racial discrimination it seeks to remedy and present a "strong basis in evidence for its conclusion that remedial action [is] necessary." *Id.* at 500, 504 (internal quotation marks omitted).[2] In response to the *Dickerson* lawsuit, the State suspended operation of section 136-28.4.

The North Carolina General Assembly then commissioned a national research and consulting firm, MGT of America ("MGT"), to study the State's transportation construction industry. In 1993, MGT completed that study, which concluded that North Carolina minority and women subcontractors suffered from discrimination in the road construction industry and were underutilized in State contracts.

After receiving the 1993 study, the General Assembly

---

[2]Applying these principles, the *Croson* Court found unconstitutional a municipal "set-aside" ordinance that *required* general contractors to subcontract 30 percent of city projects to minorities. 488 U.S. at 477, 505.

directed the Department to reimplement the Program to achieve the goals of section 136-28.4. The Department adopted various changes that the 1993 study suggested, but it set the same overall percentage goals for participation by minority and women subcontractors. Nevertheless, in 1994 the Court of Appeals of North Carolina dismissed as moot the pending legal challenge to the statute in *Dickerson*. 443 S.E.2d at 132.

In 1998, the General Assembly commissioned MGT to update the 1993 study. The resulting 1998 study concluded that minority and women subcontractors remained underutilized in state-funded road construction.

### B.

Four years later, in October 2002, the Department sought bids on a project to relocate a road in Iredell County, North Carolina. Pursuant to the Program, as reimplemented in 1993, the Department set participation goals for minority and women subcontractors of 10 percent and 5 percent, respectively. H.B. Rowe Co., Inc. ("Rowe"), a general contractor owned and operated by a white male, submitted the lowest bid on the project. Rowe's bid included 6.6 percent women subcontractor participation, but no minority subcontractor participation. The Department rejected Rowe's bid in favor of a slightly higher bid, which included 9.3 percent women subcontractor participation and 3.3 percent minority subcontractor participation.

The Department denied Rowe the contract because Rowe failed to demonstrate good faith efforts to attain the pre-designated levels of minority participation on the project. At the time of Rowe's submission, assertedly documenting its good faith efforts, it was one of only 13 submissions that the Department rejected. These 13 rejections constituted 1.5 percent of the 878 good faith efforts submissions that the Department had considered.

The Department determined that, with respect to good faith efforts, Rowe's submission contained discrepancies in the number of minority subcontractors Rowe solicited, did not demonstrate solicitation of enough minority subcontractors to allow for consideration of a fair number of quotes, did not adequately describe the subcontracting work available for the Iredell project, and evidenced no strategy for meeting the Department's participation goals. Rowe unsuccessfully appealed the denial to the State Highway Administrator.

In April 2003, Rowe filed this action in federal district court against the Department and several State officials, including Governor Michael F. Easley and Chief Engineer-Operations W.S. Varnedoe[3] in their official capacities, and Secretary of Transportation W. Lyndo Tippett and State Highway Administrator Len A. Sanderson in their official and individual capacities. Alleging that the statute and the defendants' actions in administering the Program violated Rowe's rights under the Equal Protection Clause of the Fourteenth Amendment, Rowe challenged the constitutionality of section 136-28.4 on its face and as applied. (Rowe also alleged a violation of 42 U.S.C. § 1981 (2006), which Rowe has abandoned on appeal.) Rowe sought a declaratory judgment that the statutory scheme was invalid, an injunction against its continued administration, and compensatory and punitive damages.

## C.

In 2004, at the State's request, MGT prepared and issued its third study of subcontractors employed in North Carolina's highway construction industry. As detailed within, the 2004 study marshaled a wealth of evidence to conclude that disparities in the utilization of minority subcontractors persisted. In

---

[3]Rowe's initial complaint named J.D. Goins as the then Chief Engineer of Operations at the Department. On Rowe's motion, Varnedoe was substituted for Goins after Varnedoe became Chief Engineer.

response to this study, the General Assembly substantially amended section 136-28.4, and the Governor signed the amended statute into law on August 27, 2006. The new statute modified the previous statutory scheme in five important respects.

First, the amended statute expressly conditions implementation of any participation goals on the findings of the 2004 study. Section 136-28.4, as amended, authorizes remedial action only in instances in which the study "show[s] a strong basis in evidence of ongoing effects of past or present discrimination that prevents or limits disadvantaged minority-owned and women-owned businesses from participating" as subcontractors in state-funded projects "at a level which would have existed absent such discrimination." N.C. Gen. Stat. § 136-28.4(b) (2010). The amended statute also requires that the Department, "to the extent reasonably practicable, incorporate narrowly tailored remedies identified in the [2004] Study." *Id.* § 136-28.4(b1).

Second, the amended statute eliminates the 5 and 10 percent annual goals set forth in the predecessor statute. Instead, as amended, the statute simply requires the Department to "establish annual aspirational goals, not mandatory goals, . . . for the overall participation in contracts by disadvantaged minority-owned and women-owned businesses . . . [that] shall not be applied rigidly on specific contracts or projects." *Id.* The statute further mandates that the Department set "contract-specific goals or project-specific goals . . . for each disadvantaged minority-owned and women-owned business category that has demonstrated significant disparity in contract utilization" based on availability, as determined by the study. *Id.*

Third, the amended statute narrows the definition of "minority" to encompass only those groups that have suffered discrimination. The statute had previously defined "minority" to include, among others, African Americans, Hispanic Ameri-

cans, Portuguese Americans, Asian Americans, American Indians, and Alaskan Natives. *See* N.C. Gen. Stat. § 136-28.4(c) (1989) (incorporating definition of "minority" contained in 49 C.F.R. § 23.5(i) (1989)). The amended statute replaces this list by defining "minority" as "only those racial or ethnicity classifications identified by [the] study . . . that have been subjected to discrimination in the relevant marketplace and that have been adversely affected in their ability to obtain contracts with the Department." N.C. Gen. Stat. § 136-28.4(c)(2) (2010).

Fourth, the amended statute requires the Department to re-evaluate the Program over time and respond to changing conditions. Accordingly, the Department must conduct a study similar to the 2004 study at least every five years. *Id.* § 136-28.4(b). The Department must then promulgate rules "consistent with findings made in the . . . subsequent studies," *id.* § 136-28.4(b1), and must report to the General Assembly after the release of each study "for the purpose of determining whether the provisions of [the statute] should continue in force and effect," *id.* § 136-28.4(d).

Finally, the amended statute contains a sunset provision. As amended in 2006, the statute was set to expire on August 31, 2009. N.C. Gen. Stat. § 136-28.4(e) (2009). The General Assembly subsequently extended the sunset provision to August 31, 2010. N.C. Gen. Stat. § 136-28.4(e) (2010).

Several aspects of the Department-run Program remain unchanged. For example, a prime contractor that does not meet project-specific goals may still demonstrate compliance by making good faith efforts to solicit minority and women subcontractors. 19A N.C. Admin. Code 2D.1110 (2010).

In evaluating whether a bidder has made good faith efforts, the Department considers, *inter alia*, whether the bidder "[s]olicit[ed] [minority and women subcontractors] through all reasonable and available means" and allowed sufficient

time for them to respond; followed up on these solicitations; selected work to be performed by minority and women subcontractors to increase the likelihood of meeting Program goals; provided minority and women subcontractors with adequate information about the "plans, specifications, and requirements of the contract"; negotiated in good faith with minority and women subcontractors; accepted quotes from minority and women subcontractors in the absence of sound reasons to reject them; and assisted minority and women subcontractors in obtaining bonding, lines of credit, or insurance. *See* 49 C.F.R. § 26 app. A, *cited in* 19A N.C. Admin. Code 2D.1110.

As discussed above, the good faith requirement proved permissive in practice: prime contractors satisfied the requirement in 98.5 percent of cases, failing to do so in only 13 of 878 attempts.

### D.

In light of the 2006 amendments to section 136-28.4, the defendants moved to dismiss all or part of this action on various grounds.

Initially, they contended that the 2006 amendments rendered Rowe's attack on the statute moot. The district court rejected this argument. The court recognized that the amended statute did "away with many of [the] alleged shortcomings" of its predecessor and so "undoubtedly differs from the old [statute] in material respects." *H.B. Rowe Co., Inc. v. Tippett*, No. 5:03-CV-278-BO at 20-21 (E.D.N.C. March 29, 2007). But the court concluded that Rowe's suit continued to present a live controversy because the statutory amendments did not resolve "the primary problem which the Plaintiff first complained of: the use of remedial race- and gender-based preferences without valid evidence of past racial and gender discrimination." *Id.* at 21-22. The court reasoned that Rowe could "[i]n that sense" contend that the amended statutory

scheme "'disadvantage[s] [it] in the same fundamental way.'" *Id.* at 22 (quoting *Ne. Fla. Chapter of Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 662 (1993)).

The district court did, however, dismiss all of Rowe's claims for damages against the State officials sued in their individual capacities, concluding that qualified immunity barred these claims. The court also dismissed Easley from the suit, holding that he had no role in implementing the challenged statutory scheme. In addition, the court dismissed Rowe's claims against the Department, as well as its damages claims against the individual defendants in their official capacities, holding them barred by sovereign immunity. But the court concluded that Rowe's claims for declaratory and injunctive relief against Tippett, Varnedoe, and Sanderson survived under the doctrine set forth in *Ex Parte Young*, 209 U.S. 123 (1908).

After extensive discovery and a four-day bench trial at which numerous witnesses testified and over one thousand pages of exhibits were admitted into evidence, the district court upheld the constitutionality of the statutory scheme in all respects. Rowe challenges this holding on appeal.[4]

---

[4]Rowe also contends that the district court erred in granting qualified immunity to the State officials. This argument fails. We agree with the district court that a reasonable state official would not have been on notice that section 136-28.4 violated the Constitution when Rowe submitted its bid in 2002 or filed this action in 2003. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful." (internal quotation marks omitted)). Because the State had reevaluated the necessity and scope of section 136-28.4 in light of *Croson*, and a state appellate court then dismissed as moot the only challenge ever brought against the statute, the "right at issue was [not] clearly established" at that time. *Pearson v. Callahan*, 129 S. Ct. 808, 816 (2009) (internal quotation marks omitted).

## II.

Keeping in mind the statutory scheme and the rulings of the district court, we turn to the legal principles governing Rowe's claims. As always, on appeal from a bench trial, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *See PCS Phosphate Co., Inc. v. Norfolk S. Corp.*, 559 F.3d 212, 217 (4th Cir. 2009).

### A.

"Racial classifications are simply too pernicious to permit any but the most exact connection between justification and classification." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 229 (1995) (internal quotation marks omitted). For this reason, courts subject all racial preferences—even those intended to benefit minority groups—to strict judicial scrutiny. *Id.* at 226-27; *Alexander v. Estepp*, 95 F.3d 312, 315 (4th Cir. 1996).

Although imposing a substantial burden, strict scrutiny is not automatically "fatal in fact." *Adarand*, 515 U.S. at 237. After all, "[t]he unhappy persistence of both the practice and the lingering effects of racial discrimination against minority groups in this country is an unfortunate reality, and government is not disqualified from acting in response to it." *Id.*; *Alexander*, 95 F.3d at 315. In so acting, a governmental entity must demonstrate it had a compelling interest in "remedying the effects of past or present racial discrimination." *Shaw v. Hunt*, 517 U.S. 899, 909 (1996).

Thus, to justify a race-conscious measure, a state must "identify that discrimination, public or private, with some specificity," *Croson*, 488 U.S. at 504, and must have a "'strong basis in evidence for its conclusion that remedial action [is] necessary,'" *id.* at 500 (quoting *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 277 (1986) (plurality opinion)); *see also Podberesky v. Kirwan*, 38 F.3d 147, 153 (4th Cir.

1994). As courts have noted, "there is no 'precise mathematical formula to assess the quantum of evidence that rises to the *Croson* 'strong basis in evidence' benchmark.'" *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1049 (Fed. Cir. 2008) (*Rothe II*) (quoting *W.H. Scott Constr. Co. v. City of Jackson*, 199 F.3d 206, 218 n.11 (5th Cir. 1999)).[5] Rather, the sufficiency of the state's evidence of discrimination "must be evaluated on a case-by-case basis." *Id.* (internal quotation marks omitted).

A state need not conclusively prove the existence of past or present racial discrimination to establish a strong basis in evidence for concluding that remedial action is necessary. *See, e.g.*, *Concrete Works*, 321 F.3d at 958. Instead, a state may meet its burden by relying on "a significant statistical disparity" between the availability of qualified, willing, and able minority subcontractors and the utilization of such subcontractors by the governmental entity or its prime contractors. *Croson*, 488 U.S. at 509 (plurality opinion). We further require that such evidence be "corroborated by significant anecdotal evidence of racial discrimination." *Md. Troopers Ass'n, Inc. v. Evans*, 993 F.2d 1072, 1077 (4th Cir. 1993).

Those challenging race-based remedial measures must "introduce credible, particularized evidence to rebut" the state's showing of a strong basis in evidence for the necessity for

---

[5]Like many of our sister circuits, we will review *de novo*, rather than for clear error, the district court's ultimate determination that the underlying facts demonstrate a "strong basis in evidence." *See Concrete Works of Colo., Inc. v. City & County of Denver*, 321 F.3d 950, 958 (10th Cir. 2003); *Rothe Dev. Corp. v. U.S. Dep't of Def.*, 262 F.3d 1306, 1323 (Fed. Cir. 2001); *Majeske v. City of Chicago*, 218 F.3d 816, 820 (7th Cir. 2000); *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 91 F.3d 586, 596 (3d Cir. 1996) (*Contractors Ass'n II*); *but see Eng'g Contractors Ass'n of S. Fla. Inc. v. Metro. Dade County*, 122 F.3d 895, 903-04 (11th Cir. 1997) (reviewing the determination for clear error). This accords with our precedent equating the compelling interest prong of strict scrutiny, a legal inquiry, with the "strong basis in evidence" requirement. *See Podberesky*, 38 F.3d at 153.

remedial action. *See Concrete Works*, 321 F.3d at 959 (internal quotation marks omitted). Challengers may offer a neutral explanation for the state's evidence, present contrasting statistical data, or demonstrate that the evidence is flawed, insignificant, or not actionable. *See Eng'g Contractors*, 122 F.3d at 916; *Contractors Ass'n of E. Pa., Inc. v. City of Philadelphia*, 6 F.3d 990, 1007 (3d Cir. 1993) (*Contractors Ass'n I*); *Coral Constr. Co. v. King County*, 941 F.2d 910, 921 (9th Cir. 1991). However, mere speculation that the state's evidence is insufficient or methodologically flawed does not suffice to rebut a state's showing. *See Concrete Works*, 321 F.3d at 991.

Finally, to satisfy strict scrutiny, the state statutory scheme must also be "narrowly tailored" to serve the state's compelling interest in not financing private discrimination with public funds. *Alexander*, 95 F.3d at 315 (citing *Adarand*, 515 U.S. at 227).

## B.

Precedent dictates, and the parties agree, that courts apply "intermediate scrutiny" to statutes that classify on the basis of gender. *Adkins v. Rumsfeld*, 464 F.3d 456, 468 (4th Cir. 2006); *see also Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982). A defender of such a statute meets this burden "by showing at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." *Hogan*, 458 U.S. at 724 (internal quotation marks omitted). Of course, intermediate scrutiny requires less of a showing than does "the most exacting" strict scrutiny standard of review. *See Clark v. Jeter*, 486 U.S. 456, 461 (1988).

Although the Supreme Court has established a "strong basis in evidence" requirement for race-conscious measures subject to strict scrutiny, courts "work without an analogous evidentiary label from the Supreme Court" for gender-conscious pro-

grams. *Eng'g Contractors*, 122 F.3d at 909. Our sister circuits, however, provide guidance in formulating a governing evidentiary standard. These courts agree that such a measure "can rest safely on something less than the 'strong basis in evidence' required to bear the weight of a race- or ethnicity-conscious program." *Id.*; *see also Concrete Works*, 321 F.3d at 959-60; *Contractors Ass'n I*, 6 F.3d at 1010; *Coral Constr.*, 941 F.2d at 931-32.

In defining what constitutes "something less" than a "strong basis in evidence," the courts, though diverging in their choice of words, also agree that the party defending the statute must "present[ ] sufficient probative evidence in support of its stated rationale for enacting a gender preference, i.e., . . . the evidence [must be] sufficient to show that the preference rests on evidence-informed analysis rather than on stereotypical generalizations." *Eng'g Contractors*, 122 F.3d at 910; *Concrete Works*, 321 F.3d at 959 ("[T]he gender-based measures . . . [must be] based on 'reasoned analysis rather than [on] the mechanical application of traditional, often inaccurate, assumptions.'" (quoting *Hogan*, 458 U.S. at 726)); *Contractors Ass'n I*, 6 F.3d at 1010; *Coral Constr.*, 941 F.2d at 932; *see also Mich. Rd. Builders Ass'n, Inc. v. Milliken*, 834 F.2d 583, 595 (6th Cir. 1987) (striking down gender-conscious measure where the defendants "presented no evidence that [women-owned businesses] suffered a disadvantage in competing for state contracts").

## C.

When a plaintiff alleges, as Rowe does, that a statute violates the Equal Protection Clause, not only as applied, but also on its face, the plaintiff bears a heavy burden. "The Supreme Court has, as a policy matter, expressed a strong preference for avoiding facial challenges." *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 171 (4th Cir. 2009) (en banc). The Court "disfavor[s]" such challenges because they "often rest on speculation," "run contrary to the fundamental

principle of judicial restraint," and "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450-51 (2008). In its facial challenge, therefore, a plaintiff "has a very heavy burden to carry, and must show that [a statutory scheme] cannot operate constitutionally under any circumstance." *West Virginia v. U.S. Dep't of Health & Human Servs.*, 289 F.3d 281, 292 (4th Cir. 2002) (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Of course, even if a plaintiff cannot mount a successful facial challenge, it may nonetheless be able to demonstrate that the application or enforcement of a statute is unconstitutional. Where substantial record evidence exists as to the application of the challenged statutory scheme, a court has "the concrete facts necessary" to assess such an as-applied challenge. *See Herring*, 570 F.3d at 180.

## III.

Bearing in mind the legal standards applicable to Rowe's facial and as-applied challenges, we examine the evidence offered by the parties at trial with respect to discrimination in public-sector subcontracting, and the district court's findings of fact as to that evidence.

## A.

We outline first the State's statistical evidence of discrimination in public-sector subcontracting, including its disparity evidence and regression analysis.

## 1.

The 2004 study performed by MGT, the national research and consulting firm commissioned by the State, analyzed the

difference—or disparity—between the amount of subcontracting dollars minority- and women-owned businesses actually won in a market and the amount of subcontracting dollars they would be expected to win given their presence in that market. MGT grounded its analysis in the "disparity index," which measures the participation of a given racial, ethnic, or gender group engaged in subcontracting. To calculate a disparity index, MGT divided the percentage of total subcontracting dollars that a particular group won by the percent that group represents in the available labor pool, and multiplied the result by 100. The closer the resulting index is to 100, the greater that group's participation. For example, if African American subcontractors represented 30 percent of the available labor pool and won 30 percent of the subcontracting dollars, the disparity index would be 100 or full participation. Similarly, if African American subcontractors represented 30 percent of the available labor pool and won 15 percent of the subcontracting dollars, the disparity index would be 50 or half participation.

After *Croson*, a number of our sister circuits have recognized the utility of the disparity index in determining statistical disparities in the utilization of minority- and women-owned businesses. *See, e.g.*, *Rothe II*, 545 F.3d at 1037-38; *Concrete Works*, 321 F.3d at 962-63; *W.H. Scott*, 199 F.3d at 218; *Eng'g Contractors*, 122 F.3d at 914; *Contractors Ass'n I*, 6 F.3d at 1005; *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1413-14 (9th Cir. 1991). Generally, courts consider a disparity index lower than 80 as an indication of discrimination. *See Rothe II*, 545 F.3d at 1041; *Eng'g Contractors*, 122 F.3d at 914; *see also* 29 C.F.R. § 1607.4(D) (2010) (directing federal agencies to regard a "selection rate" of lower than 80 percent as evidence of disparate impact employment discrimination). Accordingly, MGT considered only a disparity index lower than 80 as warranting further investigation.

After calculating a disparity index for each relevant racial or gender group, MGT tested for the statistical significance of

the results by conducting standard deviation analysis through the use of t-tests. As explained in the 2004 study, "[t]he t-test determines if the relationship between availability and utilization (suggested by the disparity index value) supports a conclusion of disparity. In other words, the results of the t-test allow us to conclude if . . . the results found in the disparity index represent real disparity." Put simply, standard deviation analysis "describes the probability that the measured disparity is the result of mere chance." *Eng'g Contractors*, 122 F.3d at 914. MGT considered a finding of two standard deviations (a t-value of +/- 1.96) to demonstrate "with 95 percent certainty that disparity, as represented by either overutilization or underutilization, is actually present." *See also Eng'g Contractors*, 122 F.3d at 914.

2.

The 2004 study analyzed the participation of minority and women subcontractors in construction contracts awarded and managed from the central Department office in Raleigh.[6] To determine utilization of minority and women subcontractors, MGT developed a master list of contracts mainly from State-maintained electronic databases and hard copy files. MGT then selected from that list a statistically valid sample of contracts, and calculated the percentage of subcontracting dollars

---

[6]MGT also gathered data from construction contracts awarded and managed from the 14 Department divisions across the State, as well as from preconstruction contracts, which involve work from engineering firms and architectural firms on the design of highways. However, this data was incomplete and did not allow for accurate disparity analysis. The State concedes this point, *see* Appellee's Br. 26-27, and the State's expert testified at trial that he did not rely on this analysis in forming his opinions. Accordingly, we omit discussion of division or preconstruction contracts from our analysis. It is undisputed that the data for centrally-awarded contracts does not suffer from this methodological flaw. The central data also accounts for the majority of total State highway contracting dollars awarded during the study period, and so provides a sufficiently accurate picture of Department contracting as a whole.

awarded to minority- and women-owned businesses during the 5-year period ending in June 2003.

To estimate availability—the percentage of a particular group in the relevant market area—MGT created a vendor list comprising (1) subcontractors approved by the Department to perform subcontract work on state-funded projects, (2) sub-contractors that performed such work during the study period, and (3) contractors qualified to perform prime construction work on state-funded contracts. (The study included the latter group because according to the State's expert, Dr. Vincent Eagan,[7] prime contractors are qualified to perform subcontracting work and often do perform such work. Indeed, Rowe itself performed substantial amounts of subcontracting work on Department projects during the pendency of this litigation.) To ensure accuracy, MGT submitted its master list to the Department for verification.

Based on the utilization and availability figures, the 2004 study returned the following disparity analysis:

| Status of Business | Utilization: % of Subcontracting Dollars (1998 to 2003) | | Availability: % of Labor Pool | | Disparity Index | T Value |
|---|---|---|---|---|---|---|
| | $ | % | # | % | % Utilization ÷ % Availability x 100 | |
| African American | $11,682,435.12 | 7.64% | 281 | 16.45% | 46.41 | 3.99 |
| Hispanic American | $141,828.69 | 0.09% | 7 | 0.41% | 22.62 | 0.83 |
| Asian American | $279,039.93 | 0.18% | 9 | 0.53% | 34.61 | 0.80 |
| Native American | $1,896,171.24 | 1.24% | 44 | 2.58% | 48.11 | 1.41 |
| Nonminority Women | $25,495,075.83 | 16.66% | 170 | 9.95% | 167.43 | -3.76 |
| Nonminority Men | $113,496,807.62 | 74.19% | 1197 | 70.08% | 105.85 | -1.50 |

[7]Dr. Eagan compiled research for MGT's 2004 study and has prepared over 30 studies in this area. Rowe stipulated that Dr. Eagan qualified as an expert witness in this case.

As these figures demonstrate, prime contractors underutilized all of the minority subcontractor classifications on state-funded construction contracts during the study period. The disparity index for each group was less than 80 and, thus, warranted further investigation. The t-test results, however, demonstrated marked underutilization only of African American and Native American subcontractors. For African Americans the t-value of 3.99 fell outside of two standard deviations from the mean and, therefore, was statistically significant at a 95 percent confidence level. In other words, there was at least a 95 percent probability that prime contractors' underutilization of African American subcontractors was *not* the result of mere chance. For Native American subcontractors, the t-value of 1.41 was significant at a confidence level of approximately 85 percent. The t-values for Hispanic American and Asian American subcontractors, 0.83 and 0.80, respectively, demonstrated significance at a confidence level of approximately 60 percent. The disparity index for women subcontractors found that they were overutilized during the study period. The t-value of -3.76 demonstrated that this overutilization was statistically significant at a 95 percent confidence level.

The 2004 study also revealed that, on average, *non*minority male subcontractors won more valuable subcontracts than did minority and women subcontractors. From 2000 to 2004, the average subcontract awarded to nonminority male subcontractors ($272,829) yielded more than double the dollars won by minority subcontractors ($111,106) and nearly triple the dollars won by women subcontractors ($97,682).

To corroborate the disparity data, MGT conducted a regression analysis studying the influence of certain company and business characteristics—with a particular focus on owner race and gender—on a firm's gross revenues. MGT obtained the data from a telephone survey of firms that conducted or attempted to conduct business with the Department. The sur-

vey pool consisted of a random sample of 647 such firms; of this group, 627 participated in the survey.

MGT used the firms' gross revenues as the dependent variable in the regression analysis to test the effect of other variables, including company age and number of full-time employees, and the owners' years of experience, level of education, race, ethnicity, and gender. The analysis revealed that minority and women ownership universally had a negative effect on revenue. African American ownership of a firm had the *largest* negative effect on that firm's gross revenue of all the independent variables included in the regression model. These findings led MGT to conclude that "for African Americans, in particular, the disparity in firm revenue was not due to capacity-related or managerial characteristics alone."

3.

To rebut the State's statistical evidence of public-sector discrimination, Rowe attacked the 2004 study's methodology and pointed to findings from the study that, according to Rowe, undermine the State's evidence of discrimination.

a.

Rowe argued that MGT's availability estimate insufficiently accounted for the qualifications and willingness of minority subcontractors to perform state-funded subcontracts. *See Croson*, 488 U.S. at 510. The State estimated availability of minority and women subcontractors in the relevant labor pool using "vendor data"—data reflecting the number of approved subcontractors in the State, subcontractors that performed on Department projects, and prequalified prime contractors.

Rowe's expert, Dr. George LaNoue, testified that "bidder data"—reflecting the number of subcontractors that actually bid on Department subcontracts—estimates availability better

than "vendor data." However, Dr. LaNoue acknowledged that the State does not compile bidder data. He further conceded that bidder data actually reflects "skew[ed]" availability in the context of a goals program that urges prime contractors to solicit bids from minority and women subcontractors. Furthermore, Dr. LaNoue did not contradict Dr. Eagan's previous testimony that the *only* source of bidder data available estimated a *higher* percentage of minority-owned businesses in the relevant labor pool than did MGT's vendor-based estimate. In short, neither Rowe nor its expert has demonstrated that the vendor data used in the 2004 study was unreliable, or that bidder data would have yielded less support for the conclusions reached.

Dr. LaNoue did suggest another measurement of availability: prime contractors' assessments of subcontractor qualifications. However, he acknowledged that no such documentary evidence exists in North Carolina. Moreover, when pressed, Dr. LaNoue failed to explain how such data would not be skewed by discriminatory barriers in the marketplace.

In short, Rowe's challenge to the availability estimate failed because it could not demonstrate that the 2004 study's availability estimate was inadequate. *See Concrete Works*, 321 F.3d at 991 ("[A challenger] cannot meet its burden of proof through conjecture and unsupported criticisms of [the state's] evidence."). Further, Rowe presented no viable alternative for determining availability. *See Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.*, 345 F.3d 964, 973 (8th Cir. 2003) ("[Plaintiff] failed to establish that better data was available or that [Defendant] was otherwise unreasonable in undertaking this thorough analysis and in relying on its results.").

b.

Rowe next argued that alternative disparity evidence in the 2004 study disproves the existence of discrimination. Rowe pointed to evidence that minority subcontractors participate

on state-funded projects at a level consistent with their availability in the relevant labor pool. For example, while African American subcontractors represented 16.45 percent of the workforce available for Department projects, they represented 14.9 percent of the firms participating on Department subcontracts, resulting in a disparity index of only 91. The State responded that evidence as to the *number* of minority subcontractors working on state-funded projects does not effectively rebut the evidence of discrimination in terms of subcontracting *dollars*. The State pointed to evidence indicating that prime contractors used minority businesses for low-value work in order to comply with the Department's goals. For example, in support of this contention, the State presented evidence from the 2004 study that African American ownership had a significant negative impact on firm revenue unrelated to firm capacity or experience. Rowe did not offer any contrary evidence or in any other way challenge this evidence.

The State further bolstered its position by presenting evidence that minority subcontractors have the capacity to perform higher-value work. The 2004 study concluded, based on a sample of subcontracts and reports of annual firm revenue, that exclusion of minority subcontractors from contracts under $500,000 "was not a function of capacity." During the study period, well over 90 percent of the Department's subcontracts were valued at $500,000 or less, with over 70 percent valued at or below $100,000. Further, the State's expert, Dr. Eagan, explained that "'capacity' constraints do not operate with the same force on subcontracts as they may on prime contracts" because subcontracts tend to be relatively small. *Cf. Rothe II*, 545 F.3d at 1042-45 (faulting disparity analyses of total construction dollars, including prime contracts, for failing to account for the relative capacity of firms). Rowe offered no objective evidence to the contrary.

B.

In addition to the statistical evidence set forth above, the State also presented evidence demonstrating that from Sep-

tember 1991 to April 1993, during the Program's suspension, prime contractors awarded substantially fewer subcontracting dollars to minority and women subcontractors on state-funded projects. Between 1991 and 1992, for example, the total amount of these subcontracting dollars declined 37.7 percent. The decline was most significant for Native American and women subcontractors. Meanwhile, the share of subcontracting dollars awarded to nonminority male subcontractors increased.

Rowe did not and does not argue that the actual data on which the State relied in reaching these conclusions is flawed. Instead, Rowe continues to argue that evidence of a decline in utilization does not raise an inference of discrimination. This is so, Rowe contends, because race- and gender-conscious measures afford a competitive advantage that disappears when such measures cease. However, the very significant decline in utilization of minority and women subcontractors—nearly 38 percent—surely provides a basis for a fact finder to infer that discrimination played some role in prime contractors' reduced utilization of these groups during the suspension. *See, e.g.*, *Slater*, 228 F.3d at 1174 (finding that evidence of declining minority utilization after a program has been discontinued "strongly supports the government's claim that there are significant barriers to minority competition in the public subcontracting market, raising the specter of racial discrimination"); *see also Sherbrooke Turf*, 345 F.3d at 973-74. Such an inference is particularly compelling for minority-owned businesses because, even during the 2004 study period, prime contractors continued to underutilize them on state-funded road projects.

## C.

### 1.

The State additionally relied on three sources of anecdotal evidence contained in the 2004 study: a telephone survey, personal interviews, and focus groups.

The telephone survey produced evidence of an informal "good old boy" network of white contractors that discriminated against minority subcontractors. More than three-quarters of African American respondents to the telephone survey agreed that an informal network of prime and subcontractors existed in the State, as did 74 percent of Native Americans, 71 percent of Hispanic Americans, and 67 percent of Asian Americans. Notably, more than half of African American respondents believed the network excluded their companies from bidding or winning a contract, as did 35 percent of Native Americans, 29 percent of Hispanic Americans, and 26 percent of Asian Americans. Tellingly, nearly half of *nonminority* male respondents corroborated the existence of an informal network, but only 17 percent of them believed that the network excluded *their* companies from bidding or winning contracts.

A large majority of African American respondents also reported that double standards in qualifications and performance made it more difficult for them to win bids and contracts, that prime contractors view minority firms as being less competent than nonminority firms, and that nonminority firms change their bids when not required to hire minority firms. A majority of Native American respondents reported these same inequities.

Further, 60 percent of African American respondents and 55 percent of Native American respondents believed that prime contractors sometimes dropped minority subcontractors after winning contracts. Nearly one-quarter of African American respondents and 29 percent of Native American respondents reported that they themselves had been dropped by a prime contractor after the Department awarded the contract. Only 12 percent of nonminority male respondents reported the same.

Interview and focus-group responses echoed and underscored these reports. Several respondents indicated that prime

contractors already know who they will use on the contract before they solicit bids. An African American focus-group participant stated that the "good old boy network" affects his business because prime contractors "just pick up the phone and call their buddies, the ones that they go deer hunting with every Saturday morning . . . . And so, we find ourselves out of that market completely." Another African American respondent explained that prime contractors prefer to use other less qualified minority-owned firms to avoid subcontracting with African American-owned firms. A Native American subcontractor reported that prime contractors use their preferred subcontractor regardless of the bid price. Several minority subcontractors reported that prime contractors do not treat minority firms fairly, pointing to instances in which prime contractors solicited quotes the day before bids were due, did not respond to bids from minority subcontractors, refused to negotiate prices with them, or gave minority subcontractors insufficient information regarding the project.

2.

Seeking to rebut the State's anecdotal evidence, Rowe again attacked the 2004 study's methodology. Rowe contended the anecdotal data was flawed because the 2004 study did not verify the anecdotal data *and* MGT oversampled minority subcontractors in collecting the data.

As to its first contention, Rowe offered no rationale as to why a fact finder could not rely on the State's "unverified" anecdotal data. Indeed, a fact finder could very well conclude that anecdotal evidence need not—and indeed cannot—be verified because it "is nothing more than a witness' narrative of an incident told from the witness' perspective and including the witness' perceptions." *Concrete Works*, 321 F.3d at 989.

Rowe's second contention also misses the mark. As our precedent makes clear, anecdotal evidence simply supple-

ments statistical evidence of discrimination. *See Md. Troopers*, 993 F.2d at 1077. Thus, the State's expert, Dr. Eagan, testified that the 2004 study oversampled representatives from these groups "to get at the problems faced by women and minorities." Surveying more nonminority men would not have advanced the inquiry. Moreover, Dr. Eagan testified that although the study oversampled minority groups, the samples were randomly selected.

To rebut the substance of the anecdotal data on which the State relies, Rowe pointed to evidence indicating that minority subcontractors enjoy excellent or good relationships with prime contractors. For example, 75 percent of African American respondents to the telephone survey rated their experiences with prime contractors as excellent or good, as did over 90 percent of Native American respondents. These responses indicate that, when utilized on contracts, minority subcontractors enjoy positive experiences with prime contractors. But they do not negate the State's compelling anecdotal evidence that minority subcontractors face race-based obstacles to successful bidding.

### D.

After consideration of the above evidence and extensive argument of counsel, the district court granted judgment to the State, upholding in all respects the constitutionality of both section 136-28.4 and the Department's administration of the Program.

In its written opinion, the district court found as fact that (1) "[d]isparity ratios [in the 2004 study] . . . highlighted the underutilization of [minority subcontractors] by prime contractors bidding on state funded highway projects"; (2) the General Assembly relied on evidence "demonstrat[ing] a dramatic decline in the utilization of [minority subcontractors] during the [P]rogram's suspension"; (3) "anecdotal support relied upon [by] the legislature confirmed and reinforced the

general data demonstrating the underutilization of [minority subcontractors]"; and (4) "the average contracts awarded [women subcontractors] are significantly smaller than those awarded [other subcontractors]." *H.B. Rowe, Inc. v. Tippett*, 589 F. Supp. 2d 587, 596 (E.D.N.C. 2008). Given the evidence outlined above, we cannot conclude that the district court clearly erred with respect to any of these findings.

This, of course, does not end our inquiry. We must next determine if these facts justify the court's ultimate conclusion that the North Carolina statutory scheme withstands constitutional challenge.

## IV.

We first address whether the State's statutory scheme as it relates to minorities survives strict scrutiny review.

## A.

Strict scrutiny requires that we conduct "'the most exacting judicial examination'" of the evidence the State put forth to support its minority participation goals. *Md. Troopers*, 993 F.2d at 1076 (quoting *Wygant*, 476 U.S. at 273). We have done so and conclude, for the following reasons, that the State presented a "strong basis in evidence" for its conclusion that the minority participation goals were necessary to remedy discrimination against African American and Native American subcontractors.

## 1.

As previously explained in detail, the State's data powerfully demonstrates that prime contractors grossly underutilized African American and Native American subcontractors in public sector subcontracting during the study period. These findings have particular resonance because since 1983, the General Assembly has encouraged minority participation in

state-funded highway projects, and yet African American and Native American subcontractors continue to be underutilized on such projects.

Moreover, the disparity index in the 2004 study demonstrated statistically significant underutilization of African American subcontractors at a 95 percent confidence level, and of Native American subcontractors at a confidence level of approximately 85 percent. Although the probative force of the evidence relating to African American subcontractors is stronger than the evidence relating to Native American subcontractors, the evidence in the 2004 study for both groups demonstrates a high likelihood of actual disparity.

The State bolstered the disparity evidence with regression analysis demonstrating that African American ownership correlated with a significant, negative impact on firm revenue. Further, as the district court found, the State demonstrated that there was a "dramatic decline in the utilization of [minority subcontractors] during the [P]rogram's suspension." *H.B. Rowe, Inc.*, 589 F. Supp. 2d at 596. Both Native American and African American subcontractors experienced significant declines in subcontracting dollars during that period.

To summarize, the State's evidence showing a gross statistical disparity between the availability of qualified African American and Native American subcontractors and the amount of subcontracting dollars they win on public sector contracts establishes the necessary statistical foundation for upholding the minority participation goals with respect to these groups.[8] *See Croson*, 488 U.S. at 509; *id.* at 502 (high-

---

[8]We note that the probative force of the evidence is much weaker for businesses owned by Hispanic Americans and Asian Americans, as the disparity figures for these groups were significant at a confidence level of less than 60 percent. Of course, the lack of statistical significance may be due to the small number of these minority groups in the relevant labor pool: MGT estimated that of the 1708 firms available to perform subcon-

lighting Richmond's inability to show "what percentage of total city construction dollars minority firms now receive as subcontractors on prime contracts let by the city"); *cf. Cone Corp. v. Hillsborough County*, 908 F.2d 908, 915-16 (11th Cir. 1990) (finding statistical evidence of disparity in public sector subcontracting dollars sufficient to defeat summary judgment); *Concrete Works*, 321 F.3d at 984 (finding sufficient evidence of discrimination in construction industry despite *over*utilization of minority businesses on city projects subject to goals program). Therefore, we next consider whether the State's anecdotal evidence of discrimination against these two groups sufficiently supplements the State's statistical showing.

2.

The surveys in the 2004 study exposed an informal, racially exclusive network that systemically disadvantaged minority subcontractors. The State could conclude with good reason that such networks exert a chronic and pernicious influence on the marketplace that calls for remedial action. *See Slater*, 228 F.3d at 1170 ("As a result [of closed contracting networks], minority-owned firms are seldom or never invited to bid for subcontracts on projects that do not contain affirmative action requirements." (internal quotation marks omitted)).

In *Maryland Troopers*, we cautioned against inferring discrimination from reports of cronyism absent evidence of racial animus. 993 F.2d at 1077. Here, however, majorities of African American and Native American respondents agreed that prime contractors have higher standards for minority sub-

---

tracting work on state-funded contracts, only 9 or .53 percent were owned by Hispanic Americans, and only 7 or .41 percent, were owned by Asian Americans. But, the fact that such small percentages of firms, making up less than 1 percent of all available firms, were underutilized (perhaps by chance) fails to evidence the "significant statistical disparity" *Croson* requires. *See Contractors Ass'n I*, 6 F.3d at 1007-08.

contractors, view minority subcontractors as being less competent than nonminority businesses, change their bidding practices when not required to hire minority subcontractors, and drop minority subcontractors after winning contracts. Together, these responses suggest strongly that the underutilization of African American and Native American subcontractors is more than a mere byproduct of misguided yet color-blind cronyism. Rather, they indicate that racial discrimination is a critical factor underlying the gross statistical disparities presented in the 2004 study. Unlike in *Maryland Troopers*, where we found "no . . . gross statistical disparity, corroborated by . . . anecdotal evidence," *id.* at 1078 (internal quotation marks omitted), the State here presented substantial statistical evidence of gross disparity, corroborated by disturbing anecdotal evidence.

### 3.

In sum, the State has met its burden of producing a "strong basis in evidence" for its conclusion that minority participation goals were necessary to remedy discrimination against African American and Native American (but not Asian American or Hispanic American) subcontractors. Particularly compelling is the State's evidence that prime contractors grossly underutilized African American and Native American subcontractors during the study period and that these subcontractors are disadvantaged by a racially exclusive "old boys network." In circumstances like these, the Supreme Court has made it abundantly clear that a state can remedy a public contracting system that withholds opportunities from minority groups because of their race. *See Adarand*, 515 U.S. at 237.

### B.

To withstand constitutional scrutiny, however, the North Carolina statutory scheme must also be narrowly tailored to achieve the State's compelling interest in remedying discrimination against African American and Native American sub-

contractors in public-sector subcontracting. We have identified the following factors as relevant in evaluating whether a state statute is narrowly tailored:

> (1) the necessity of the policy and the efficacy of alternative race neutral policies; (2) the planned duration of the policy; (3) the relationship between the numerical goal and the percentage of minority group members in the relevant population; (4) the flexibility of the policy, including the provision of waivers if the goal cannot be met; and (5) the burden of the policy on innocent third parties.

*Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 344 (4th Cir. 2001) (en banc). Finally, we consider a program's "overinclusiveness," *Croson*, 488 U.S. at 506, *i.e.*, "its tendency to benefit particular minority groups that have not been shown to have suffered invidious discrimination," *Alexander*, 95 F.3d at 316. We address each factor in turn.

1.

Narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives," but a state need not "exhaust[ ] . . . every conceivable race-neutral alternative." *Grutter v. Bollinger*, 539 U.S. 306, 339 (2003). The 2004 study details numerous alternative race-neutral measures aimed at enhancing the development and competitiveness of small or otherwise disadvantaged businesses in North Carolina.

For example, the State's Small Business Enterprise Program favors small businesses for highway construction procurement contracts of $500,000 or less. This program permits the Department to waive the institutional barriers of bonding and licensing requirements on such contracts. *See* N.C. Gen. Stat. § 136-28.10. The Department also contracts for support services to assist disadvantaged business enterprises with

bookkeeping and accounting, taxes, marketing, bidding, nego-
tiation, and other aspects of entrepreneurial development.

Indeed, Rowe identifies no viable race-neutral alternatives
that North Carolina has *failed* to consider and adopt. Notably,
the State has undertaken most of the race-neutral alternatives
identified by the federal Department of the Treasury in its reg-
ulations governing the federal DBE program. *See* 49 C.F.R.
§ 26.51(b); *see also N. Contracting, Inc. v. Illinois*, 473 F.3d
715, 724 (7th Cir. 2007) (upholding the constitutionality of a
program that, like this one, "use[d] nearly all of the methods
described in § 26.51(b) to maximize the portion of the goal
that will be achieved through race-neutral means"). We thus
conclude that the State gave serious good faith consideration
to race-neutral alternatives prior to adopting the challenged
statutory scheme.

Despite these race-neutral efforts, the 2004 study demon-
strated that disparities continue to exist in the utilization of
African American and Native American subcontractors in
state-funded highway construction subcontracting. These per-
sistent disparities indicate the necessity of a race-conscious
remedy. *See Contractors Ass'n I*, 6 F.3d at 1008 (upholding
against summary judgment an ordinance that was "enacted . . .
only after race-neutral alternatives proved insufficient to
improve minority participation in City contracting").

2.

As to the duration of the statutory scheme, the district court
found two facts particularly compelling in establishing that it
was narrowly tailored: the statute's provisions (1) setting a
specific expiration date and (2) requiring a new disparity
study every 5 years. *H.B. Rowe, Inc.*, 589 F. Supp. 2d at 597
(discussing N.C. Gen. Stat. § 136-28.4(b), (e)). We agree.
"The . . . program's inherent time limit and [provisions requir-
ing regular reevaluation] ensure that it . . . is carefully
designed to 'endure[ ] only until . . . the discriminatory

impact' has been eliminated." *Slater*, 228 F.3d at 1179 (quoting *United States v. Paradise*, 480 U.S. 149, 178 (1987)).[9]

3.

The State has also demonstrated that the Program's participation goals are related to the percentage of minority subcontractors in the relevant markets in the State. *See* N.C. Gen. Stat. § 136-28.4(b1). The Department has taken concrete steps to ensure that these goals accurately reflect the availability of minority-owned businesses "on a project-by-project basis." First, the Department generates a report detailing the type of work that it anticipates subcontractors will perform on a particular project. Next, a goal-setting committee consults its database of certified minority contractors in the relevant geographic area capable of performing those types of work. Consulting the report, the database, and its own members' experience, the committee then sets a project-specific participation goal. Notably, this goal-setting process does not mechanically require minority participation; in fact, between July 2002 and February 2004, the committee set a goal of *zero* percent minority participation on approximately 10 percent of projects.

Rowe contends that the Department does not do enough to evaluate the relative qualifications of minority businesses and whether or not they are willing and able to perform services on particular projects. However, Rowe neither explains how the careful process currently in place falls short nor offers a viable alternative method. *See Sherbrooke Turf*, 345 F.3d at 973-74; *Concrete Works*, 321 F.3d at 991.

---

[9]Rowe contends that the General Assembly's one-year extension of the statute's sunset provision renders that provision meaningless. However, in accord with the statute's directive, the next disparity study was scheduled for completion in 2009, and the extension simply allowed more time for the completion and consideration of that study. At oral argument, counsel for the State informed us that the newly completed 2009 disparity study demonstrated continued underutilization of minority-owned businesses.

### 4.

As the district court recognized, the flexibility of the statutory scheme is also a significant indicator of narrow tailoring. The Program contemplates a waiver of project-specific goals when prime contractors make good faith efforts to meet those goals. *See* 19A N.C. Admin. Code 2D.1110. Good faith efforts essentially require only that the prime contractor solicit and consider bids from minorities. The State does not require or expect the prime contractor to accept any bid from an unqualified bidder, or any bid that is not the lowest bid. Moreover, prime contractors can bank any excess minority participation for use against future goals over the following two years. Given the lenient standard and flexibility of the "good faith" requirement, it comes as little surprise that as of July 2003, only 13 of 878 good faith submissions—including Rowe's—had failed to demonstrate good faith efforts.

### 5.

With respect to the burden imposed by the Program, Rowe offers two arguments in support of its contention that the Program places a substantial burden on prime contractors.

First, Rowe contends that the Program creates onerous solicitation and follow-up requirements. However, at trial, Rowe's president testified that the company's secretaries run the solicitation program with *no need* for additional employees dedicated to the task.

Second, Rowe maintains that complying with project-specific goals forces it to subcontract millions of dollars of work that it could perform itself for less money. But Rowe offered no evidence to support this claim. The State, on the other hand, offered evidence from the 2004 study that prime contractors *need not* subcontract work they can self-perform.

6.

Lastly, Rowe contends that the statutory scheme is "overinclusive." By its own terms, however, the statute expressly limits relief to "those racial or ethnicity classifications . . . that have been subjected to discrimination in the relevant marketplace and that have been adversely affected in their ability to obtain contracts with the Department." N.C. Gen. Stat. § 136-28.4(c)(2). In tailoring the remedy in this way, the General Assembly did not "random[ly] inclu[de] . . . racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry." *Croson*, 488 U.S. at 506. Rather, the statute contemplates participation goals only for those groups shown to have suffered discrimination. As such, North Carolina's statute differs from measures that have failed narrow tailoring for overinclusiveness. *See, e.g.*, *id.*; *Associated Gen. Contractors of Ohio, Inc. v. Drabik*, 214 F.3d 730, 737 (6th Cir. 2000) ("By lumping together the groups of [African Americans], Native Americans, Hispanics, and [Asian Americans] . . . , the [challenged statute] may well provide preference where there has been no discrimination.").[10]

In sum, we have considered the relevant factors and conclude that the statutory scheme is narrowly tailored to achieve the State's compelling interest in remedying discrimination in public-sector subcontracting against African American and Native American subcontractors.

V.

We turn next to the question of whether the State's statutory scheme with respect to women survives intermediate scrutiny.

---

[10]Although the statute, on its face, does not name Asian Americans and Hispanic Americans—two groups for which the State failed to provide a strong basis in evidence—the State concedes that it certifies those groups for inclusion in the Program. We address this infirmity in the State's application of the Program in Part VI, *infra*.

A.

The 2004 study's public-sector disparity analysis demonstrated that, unlike minority-owned businesses, women-owned businesses won far more than their expected share of subcontracting dollars during the study period. In other words, prime contractors substantially *over*utilized women subcontractors on public road construction projects. Moreover, MGT calculated the *over*utilization of women subcontractors as statistically significant at a 95 percent confidence level.

Nevertheless, the district court found discrimination against women-owned businesses in the public sector. The court based its conclusion on evidence that women won subcontracts that were, on average, worth one-third of the value of subcontracts won by nonminority males. *H.B. Rowe, Inc.*, 589 F. Supp. 2d at 596. The State also offered evidence that prime contractors' awards to women subcontractors in the public sector declined significantly during the Program's suspension. This evidence, although probative of discrimination, cannot overcome far more compelling evidence from the 2004 study demonstrating prime contractors' more recent, statistically significant overutilization of women-owned businesses in the public sector. In short, the *public*-sector evidence as a whole does not evince the "exceedingly persuasive justification" the Supreme Court requires. *See United States v. Virginia*, 518 U.S. 515, 531 (1996).

B.

Perhaps recognizing this, the State relies heavily on *private*-sector data from the 2004 study demonstrating that prime contractors significantly underutilized women subcontractors in the general construction industry statewide and in the Charlotte area. However, because the 2004 study provided no t-test analysis on the private-sector disparity figures to calculate statistical significance, we cannot determine whether

this private underutilization was "the result of mere chance." *Eng'g Contractors*, 122 F.3d at 914.

Nor did the State present evidence indicating the extent to which women-owned businesses competing on *public*-sector road projects—the targets of the remedial statute—vied for *private*-sector subcontracts in the general construction industry. This evidentiary gap is troubling because prime contractors overutilize women subcontractors in the public sector. Thus, women-owned businesses may well seek less private-sector work.

The State also failed to present any anecdotal evidence indicating that women subcontractors successfully bidding on State contracts faced private-sector discrimination. *See Md. Troopers*, 993 F.2d at 1077 (warning against inferring discrimination from statistics alone); *cf. Coral Constr.*, 941 F.2d at 933 (relying on a lengthy affidavit from a woman business owner describing her success in winning public dollars, but her failure in private-sector contracting). Missing, too, is any evidence that prime contractors that discriminate against women subcontractors in the private sector nevertheless win public-sector contracts. *Cf. Concrete Works*, 321 F.3d at 976-77 (relying on anecdotal evidence that general contractors that used minority and women subcontractors on public projects refused to use them on private projects).[11]

---

[11]We do not suggest that the proponent of a gender-conscious program must always tie private discrimination to public action. *See Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1580 (11th Cir. 1994) (holding that intermediate scrutiny does not require showing government involvement in discrimination); *Coral Constr.*, 941 F.2d at 932. *But see Mich. Rd. Builders*, 834 F.2d at 595 (requiring evidence of discrimination in public sector). Rather, we simply hold where, as here, there exists substantial probative evidence of overutilization in the relevant public sector, a state must present something more than generalized private-sector data unsupported by compelling anecdotal evidence to justify a gender-conscious program.

Moreover, the State failed even to establish the amount of overlap between *general* construction and *road* construction subcontracting. Although road construction involves some of the same subcontracting work as general construction, the dearth of evidence as to the correlation between public road construction subcontracting and private general construction subcontracting severely limits the private data's probative value in this case.

## C.

Finally, the anecdotal evidence that the State did present falls short of justifying the Program's gender participation goals. For example, although 53 percent of women respondents agreed that an exclusive network exists in the construction industry, only 27 percent believed that the network excluded their firms. By contrast, 78 percent of African American respondents and 74 percent of Native American respondents agreed such a network exists, and 53 percent of African American respondents and 35 percent of Native American respondents believed that they, themselves, had been excluded. Further, while a majority of African American and Native American respondents believed that prime contractors held them to higher standards than nonminority males, only 40 percent of women respondents held this view.

## D.

In short, with respect to the gender participation goals, the State cannot overcome the strong evidence of overutilization in the public sector. The proffered private-sector data fails to establish discrimination in the particular field in question. *See Ensley Branch*, 31 F.3d at 1580-81. Further, the anecdotal evidence indicates that most women subcontractors in North Carolina do not experience discrimination. Accordingly, we conclude that the State failed to present sufficient evidence to support the Program's current inclusion of women subcontractors in setting participation goals.

VI.

To summarize, North Carolina has put forth strong evidence that discrimination against African American and Native American subcontractors continues to limit their participation on state-funded highway construction contracts. The State has a compelling interest, indeed an "absolute duty," to remedy this injustice, affecting as it does the distribution of public funds. *See Croson*, 488 U.S. at 518 (Kennedy, J., concurring in part and concurring in the judgment) (a "[s]tate has the power to eradicate racial discrimination and its effects in both the public and private sectors, and the absolute duty to do so where those wrongs were caused intentionally by the State itself").

The State has enacted a narrowly tailored response to this problem that addresses discrimination while respecting the virtues of the free market. Thus, unlike the City of Richmond's unconstitutional set-aside program in *Croson*, North Carolina's statutory scheme does not mandate that specific percentages of subcontracting dollars always be apportioned to minority groups or women. Rather, the statute *prohibits* the Department from setting project-specific participation goals "rigidly." N.C. Gen. Stat. § 136-28.4(b1). Instead, such goals must be "consistent with availability of" minority and women subcontractors. *Id.*; *cf. Contractors Ass'n II*, 91 F.3d at 607 (finding that city's ordinance mandating across-the-board goals for minority- and women-owned business participation, based on percentage of minorities and women in the general population, was not narrowly tailored). And if the realities of the marketplace prevent a prime contractor from meeting these project-specific goals, the State waives them on a showing of good faith efforts to solicit and consider bids from minority and women subcontractors. Only in the rarest of cases has a prime contractor failed to demonstrate good faith efforts to solicit minority or women subcontractors.

Moreover, as amended in 2006, section 136-28.4 does not authorize the Department to set project-specific participation

goals unless the most recent disparity study, which must be conducted at least every 5 years, demonstrates "a strong basis in evidence of ongoing effects of past or present discrimination that prevents or limits disadvantaged [minority and women subcontractors] from participating in [state-funded transportation contracts] at a level which would have existed absent such discrimination." N.C. Gen. Stat. § 136-28.4(b); *cf. Croson*, 488 U.S. at 506 (faulting Richmond's set-aside program for "random[ly] inclu[ding] . . . racial groups that . . . may never have suffered from discrimination in the construction industry"); *Rothe II*, 545 F.3d at 1049 (finding statute with across-the-board 5 percent goal of minority participation unconstitutional on its face because it was not supported by strong basis in evidence).

Thus, the North Carolina General Assembly has crafted legislation that withstands constitutional scrutiny. In light of the statutory scheme's flexibility and responsiveness to the realities of the marketplace, Rowe has failed to establish "that no set of circumstances exists under which [section 136-28.4] would be valid." *Salerno*, 481 U.S. at 745. Indeed, given the State's strong evidence of discrimination against African American and Native American subcontractors in public-sector subcontracting, the State's application of the statute to these groups is certainly constitutional. Thus, Rowe has "failed to shoulder [its] heavy burden" in challenging the facial validity of section 136-28.4. *Id.*

However, because the State has failed to justify its application of the statutory scheme to women, Asian American, and Hispanic American subcontractors, we cannot find those applications constitutional.[12] When some applications of a statute are constitutional, but others are not, the Supreme

---

[12]We emphasize that although the 2004 study did not provide a basis to enforce the Program with respect to these groups, we recognize the possibility that at some point in the future the State may come forth with evidence that would justify their inclusion in the Program.

Court has explained that courts should strive, if feasible and consistent with the legislature's intent, "to enjoin only the unconstitutional applications of a statute while leaving other applications in force." *Ayotte v. Planned Parenthood of N. New Eng.*, 546 U.S. 320, 329 (2006); *cf. Contractors Ass'n I*, 6 F.3d at 1008 (severing unconstitutional subsections of challenged statute, rather than striking down entire statute for "overinclusiveness").

This course is entirely appropriate here. Under controlling North Carolina law, it seems clear that "the remaining [applications] of the legislation can stand on [their] own," and that "the General Assembly would have enacted the remainder absent the offending portion." *State v. Webb*, 591 S.E.2d 505, 511 (N.C. 2004) (internal quotation marks omitted). Applying the challenged statute only to African American and Native American subcontractors fulfills the statute's purpose of remedying the "ongoing effects of past or present discrimination" in state-funded transportation contracts. N.C. Gen. Stat. § 136-28.4(b). We are satisfied that the General Assembly would choose to maintain the application of the statute to remedy discrimination against any minority that continues to suffer it. Mindful that "a court cannot use its remedial powers to circumvent the intent of the legislature," *Ayotte*, 546 U.S. at 330 (internal quotation marks omitted), we will respect the will of the people of North Carolina and their elected leaders.

Accordingly, we affirm the judgment of the district court with regard to the facial validity of the statute, and with regard to its application to African American and Native American subcontractors. We reverse the district court's judgment insofar as it upholds the constitutionality of section 136-28.4 as applied to women, Asian American, and Hispanic American subcontractors. We remand to the district court to fashion an appropriate remedy consistent with this opinion.

*AFFIRMED IN PART, REVERSED IN PART,*
*AND REMANDED*

NIEMEYER, Circuit Judge, concurring in the judgment:

With genuine admiration for the care with which the majority opinion addresses the principal issues—and I concur in much of what is written—I remain troubled by contextual issues that the majority has not addressed and that indicate an effort by North Carolina to maintain a broad affirmative-action program to assure minority representation and diversity in public contracting, regardless of whether actual discrimination exists.

When we decide cases involving race-conscious and gender-conscious government programs, we must remain especially vigilant in recalling that such programs are presumptively unconstitutional, in violation of the Equal Protection Clause. *See Shaw v. Reno*, 509 U.S. 630, 643-44 (1993). Moreover, to approve race-conscious or gender-conscious programs simply to further a policy of diversity in public contracting perpetuates, not eliminates, discrimination. Only when there is clear evidence of actual discrimination should we approve a state government's race-conscious or gender-conscious considerations, and only then when the program is designed to remedy the discrimination.

It is noteworthy that the North Carolina program in this case was created without any evidence of discrimination. Rather, it was initiated in the 1980s with a quota system that was the product of policies designed to spread public contracting among minorities and women simply for the purpose of racial and gender representation. The State only undertook to determine whether actual discrimination existed in public contracting when *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989), made clear that North Carolina's program was constitutionally infirm. As a result, North Carolina has never had—and, indeed, never will have—the opportunity to determine whether discrimination existed in public contracting absent the affirmative-action program's effects on the market. And even after concluding that discrimination did in

fact exist, the State reinstituted the exact same quotas that it had previously used.

To be sure, the program has changed over time, but even the immediate past version of the North Carolina statute required that quotas be satisfied through the participation of a broad array of ethnic peoples, such as Portuguese Americans, Asian Americans, American Indians, and Alaskan natives, regardless of whether evidence of discrimination against those groups existed.

In its current form, the North Carolina statute creating the affirmative-action program provides little to no guidance regarding how it is to be implemented, leaving an unnerving amount of discretion to a small number of Department of Transportation administrators. The current statute uses the 2004 disparity study as a predicate to justify race-based and gender-based remedial efforts and directs the Department of Transportation to commission future studies to determine whether future remedial efforts are necessary. Specifically, the statute requires the North Carolina Department of Transportation to "establish annual aspirational goals, not mandatory goals, . . . [that] shall not be applied rigidly on specific contracts or projects." N.C. Gen. Stat. § 136-28.4(b1).

But the statute does not provide any range nor give any criteria for these goals. Instead, it authorizes the Department to act based solely on the Department's own interpretation of the 2004 study and future studies that the Department itself must commission. As a result, Department administrators, not state legislators, are those responsible for determining which groups qualify as "minorities," and they are statutorily authorized to make that determination when a group has been "subjected to discrimination in the relevant marketplace" and has been "*adversely affected* in [its] ability to obtain contracts with the Department." *Id.* § 136-28.4(c)(2) (emphasis added). These administrators are also given the power to determine,

in their sole discretion, adequate levels of representation in obtaining public contracts for each minority group.

After the Department, in its discretion, adopts "aspirational goals," it is given the additional authority to decide whether prime contractors have made "good faith efforts" to meet the aspirational goals, which in themselves are not to be "applied rigidly."

The result is an amorphous exhortation to favor minorities and women in public contracting. I question how it can be concluded that actual discrimination is being addressed and, if so, whether the means used can be sufficiently narrowly tailored so as to comply with the Constitution. I take little comfort from the fact that the only meaningful oversight of this process has been review by the federal courts following years of litigation. While the majority in this case thoroughly scrutinizes whether the implementation of this program is genuinely aimed at fighting actual discrimination in state contracting, the fact that such review is necessary demonstrates that the State and its administrators have few if any standards by which they ensure that their program complies with constitutional requirements.

Our holding in this case is prime evidence of the problem. We conclude that the state officials who used the 2004 study to justify favoring Asian Americans, Hispanic Americans, and women had insufficient evidence of discrimination to do so. That finding hardly instills confidence in the State's continued application of ad hoc standards purportedly designed to remedy actual discrimination.

Moreover, the arbitrariness of the entire North Carolina structure for determining when to consider race and gender is displayed by the weakness of the statistical data on which North Carolina officials have been willing to rely. Several examples demonstrate this.

*First*, as noted by the majority, the data in the study regarding contracts awarded by the Department's *division offices* is statistically invalid. While the majority of contract dollars were handed out on contracts from the central office, the division-let contracts represented approximately one-third of the total value of state contracts. The program affords privileges to women and minorities in bidding on such contracts, despite the fact that *no evidence whatsoever* indicates that these contracts were awarded in a disparate manner.

*Second*, the State asserts that a decrease in subcontracts going to minority-owned and women-owned enterprises during a period when the program was suspended indicates that, absent preferences for minorities and women, discrimination would take hold. But the significance, if any, in the drop in the utilization of minorities and women during suspension of the program is a classic chicken-and-egg problem. If the underlying market for contracting in North Carolina was discriminatory prior to implementation of the program, then the drop in utilization during suspension of the program may have reflected the fact that the program had helped remedy discrimination. If, on the other hand, the underlying market was nondiscriminatory, then the drop in utilization merely reflected the removal of the unfair competitive advantage given to minorities and women. *See W. States Paving Co. v. Wash. State Dep't of Transp.*, 407 F.3d 983, 1000 (9th Cir. 2005).

We cannot resolve this question because no evidence exists regarding whether disparities existed at the time the program first began. It might be surmised that fewer minority-owned and women-owned businesses will receive subcontracts on Department projects if the program is suspended. But it cannot be determined whether this change would reflect a return to a fair, competitive status quo or a discriminatory marketplace. Moreover, regardless of how we interpret the drop in utilization during the period of the program's suspension, it is rather bold, and perhaps even invalid, to assume that the mar-

ket will react to suspension of the program in the same manner that it did 20 years ago.

In addition, even if we had reason to believe that the drop in utilization during suspension of the program indicated potential discrimination in the marketplace in the early 1990s, it still could not justify the continued use of race-conscious and gender-conscious policies. Affirmative action is only appropriate to remedy past or ongoing discrimination, not to stave off discrimination that might hypothetically occur in the future. *See Hayes v. N. State Law Enforcement Officers Ass'n*, 10 F.3d 207, 217 (4th Cir. 1993) ("[E]ven when race can be taken into account to *attain* a balanced work force, racial classifications may not be employed to *maintain* a balanced work force" (emphasis in original)). Should intentional discrimination appear without this program, future remedial efforts could become appropriate. But we should not ratify the government's use of race in perpetuity based on mere concern that such a result might occur. Were we to do so, we would send the terrible message that our society has been and always will be divided by race, that racial hostility is an inevitable consequence of a heterogeneous society, and that government cannot escape classifying its people by the color of their skin.

*Third*, as the majority rightly points out, the evidence regarding state subcontracting practices indicates that women are grossly *over*utilized. The State nonetheless contends that women too must be benefited by affirmative action. To justify this "aspiration," the State relies on evidence of purported discrimination in the *private building* construction industry without demonstrating how that evidence justifies a need for affirmative action in awarding *public contracts from the Department of Transportation*. Because this evidence comes from a wholly dissimilar contracting market, it is inappropriate to rely on it to draw inferences regarding Department contracting. Moreover, the evidence from the private building sector is at best mixed and therefore fails to justify affording privileges to women.

*Fourth*, when considering only valid statistical evidence— data that are actually tied to contracts awarded by the Division's central office—the evidence fails to justify the sweep of preferential privileges afforded to each minority group and women in the program. While each of the minority groups were shown to be underutilized in terms of subcontract dollars relative to their market share, *only African Americans* were underutilized at a statistically significant level. *Cf. Croson*, 488 U.S. at 501, 509 (inference of discrimination justifying remedial affirmative action may only be drawn by evidence of "gross" and "significant" disparity). The majority recognizes that Native Americans were underutilized at a confidence level of approximately .15, a result that is not, in most conventional statistical analyses, considered statistically significant.* Similarly, the regression analysis concluding that firm experience, capacity, and the like were not responsible for the shortfall in contract dollars supported a finding that the disparities were a result of race and not other factors only *with respect to African Americans*. In other words, with regards to Native Americans—as with Asian Americans and Hispanic Americans—the study could not conclude with confidence that the shortfall in contract dollars was not due to mere

---

*Here I follow the study in examining statistical significance at the .05 level. When a result is significant at the .05 level, it means that the probability of that result occurring by chance is 5% or less. *See, e.g.*, Sherri L. Jackson, *Research Methods and Statistics: A Critical Thinking Approach* 168-69 (3d ed. 2009). While statistical significance is arbitrary and imperfect, the .05 confidence level is often used in the social sciences as a marker of when a result is a product of some external influence, rather than ordinary variation or sampling error. *See, e.g.*, Earl Babbie, *The Practice of Social Research* 483 (12th ed. 2010).

We need not decide here whether statistical significance at the .05 level is the bellwether by which we determine whether the State's statistics are sufficient to support a compelling state interest. Rather, I merely point out that the study's results regarding Native Americans, Hispanic Americans, and Asian Americans do not reach the level of significance that *the study itself* sets out as the standard by which one could confidently conclude that discrimination was at work.

chance, a lack of firm capacity, or some other race-neutral explanation.

The Department, perhaps recognizing these infirmities, chose to fill the gaps in its data regarding public contracting by relying on inapplicable and therefore invalid data from the private sector. This demonstrates the structural weakness of the entire program. It is indeed disquieting that the State believes that such a flimsy approach can justify governmental decisionmaking based on race and gender. The majority wisely rejects the State's approach and properly holds the State to the burden of demonstrating *a strong basis in evidence* leading to an inference of discrimination in *Department* subcontracting. *Cf. Croson*, 488 U.S. at 500. But the fact that North Carolina has come to federal court and unrepentantly relied on dubious—and, in some cases, completely discredited—data to support its conjecture that discrimination is persistent in state contracting might well lead us to conclude that the State is now more interested in seeking a post hoc justification for a program designed to engineer proportional race and gender representation, regardless of discrimination, than in conducting a good-faith, open-minded inquiry into whether remedial efforts are necessary.

I do not doubt that North Carolina's program was conceived with the benign motive of preventing discrimination in public contracting. But its approach of making contracting decisions in favor of minorities and women, based on the flimsiest of evidence, runs the risk of actually creating and perpetuating discrimination.

While I would be more inclined to strike down the entire program as a violation of the Equal Protection Clause, I am willing to allow, as the majority does, North Carolina the opportunity to review and adjust its program in light of what we have written.

Accordingly, I concur in the judgment.

BEATY, Chief District Judge, concurring:

I concur fully in the majority opinion in this case, and I agree wholeheartedly with the conclusion that the North Carolina Minority Business Enterprise Program, N.C. Gen. Stat. § 136-28.4, is constitutional on its face and as applied to African Americans and Native Americans. I add only a few additional observations.

First, I am compelled to note that, in my view, the inequities that are still evident in public contracting with respect to African American subcontractors are a present reminder of past racial discrimination in North Carolina, racial discrimination that included not only enslavement and the denial of full personhood under the Constitution in the past, but that also included legally sanctioned exclusion from the most basic rights of citizenship within not-too-distant memory. *See Regents of the University of California v. Bakke*, 438 U.S. 265, 387-396 (1978) (Marshall, J., dissenting) (surveying the history of racial discrimination in this country and the Supreme Court's role in sanctioning that discrimination in *Plessy v. Ferguson*). In light of this history, the present disparities in public contracting could not be viewed as the result of non-discriminatory market forces, nor could the statistics showing the exacerbation of those disparities when the Program was previously suspended be viewed as reflecting a fair, competitive status quo. Instead, in the context of history, these disparities reflect the present effects of past discrimination, and the State has recognized this, as discussed in the majority opinion. In my view, the Program enacted by North Carolina serves the highest interest of the State in attempting to remedy this past discrimination and is fully consistent with the promise and purpose of the Fourteenth Amendment. Although there is expectant hope that at some point the Program will no longer be necessary to redress the present effects of this history, we cannot deny the history of discrimination or its lingering effects.

Finally, I would note that the majority opinion has held that the Program is unconstitutional as applied to Hispanic Americans and Asian Americans, based on the lack of statistically valid information presented by the State as to these groups. However, as noted in the majority opinion, the State may, in the future, include these groups within the Program if the State undertakes additional study and determines that inclusion of these groups in the Program is warranted. Likewise, the majority opinion has held that the evidence presented by the State would not establish a sufficient basis to justify the Program as to nonminority women, even using intermediate scrutiny. However, the State may very well include nonminority women in the Program in the future if sufficient basis exists, and in making this determination, the State may consider any underutilization of nonminority women that occurs in the absence of the Program.

Therefore, I am pleased to concur fully in the majority opinion in this case.